## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID MASON,** | ) | |
| | ) | **No. 13 CV 156** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,**[1] | ) | |
| | ) | **November 3, 2014** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

David Mason claims that he is unable to work because he suffers from a number of health problems, including depression, relentless fatigue, and a spinal disorder known as Scheuermann's disease. In July 2010, not long after Mason turned 19, he applied for supplemental security income ("SSI"). *See* 42 U.S.C. §§ 416(i), 1382(c). The Appeals Council declined to review an administrative law judge's ("ALJ") decision denying that application, so Mason brought this suit seeking judicial review. 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons Mason's motion is granted, the government's is denied, and the case is remanded for further proceedings consistent with this opinion:

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

## Procedural History

Mason applied for SSI benefits in July 2010, claiming a disability onset date of December 27, 2002. (Administrative Record ("A.R.") 117.) His application was denied initially and upon reconsideration, (id. at 64-70, 73-76), so Mason requested and was granted a hearing before an ALJ. Following the hearing the ALJ issued a decision finding that Mason is not disabled. (Id. at 19-31.) The Appeals Council declined review, (id. at 8-10), making the ALJ's decision the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Mason filed his federal complaint on January 9, 2013, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 7); *see* 28 U.S.C. § 636(c).

## Facts

Mason's health problems emerged in his early teenage years when he began experiencing back pain, dizziness, and chronic sleepiness. His back pain was attributed to Scheuermann's disease, a condition also known as "adolescent round back" that causes a curvature of the thoracic spine. *See* Stedman's Medical Dictionary 563 (28th ed. 2006). Through the years, Mason's other major symptoms, which are light-headedness and fatigue, have been attributed by various doctors to a range of conditions, including anxiety, depression, dysthymic disorder, circadian rhythm sleep disorder, chronic pain syndrome, organic sleep apnea, idiopathic hypersomnolence, chronic fatigue syndrome, and delayed sleep phase syndrome. At his hearing before the ALJ, Mason presented voluminous medical records as well as

his own testimony in support of his claim that those conditions and symptoms render him disabled.

## A.    Medical Evidence

The medical records Mason submitted at the hearing include over eight years of treatment records from a wide array of specialists, all seeking answers to Mason's persistent symptoms.  The summary that follows is organized by symptom, rather than by chronology, to help chart the course that his various doctors took in their attempts to help provide Mason relief from his complaints of pain, fatigue, dizziness, and depression.

### 1.    Scheuermann's Disease

After he was diagnosed with Scheuermann's disease in 2002, Mason began physical therapy and was fitted with a back brace to treat his spinal curvature and strengthen his back.  (A.R. 321-23, 330, 357.)  He reported to his physical therapist in 2004 that his back felt weak when he did not wear his brace.  (Id. at 321.)  Mason underwent an MRI of his back in 2004 and the radiologist described his condition as "mild thoracolumbar scoliosis," noting that his curvature had increased slightly in the previous 11 months.  (Id. at 319.)  Apparently Mason's spinal condition stabilized in the years that followed, because he did not receive active, on-going treatment or physical therapy for his Scheuermann's disease after 2008.

### 2.    Light-Headedness and Fatigue

In March 2007 Mason underwent a sleep study aimed at finding the answer to his persistent fatigue.  (Id. at 470-71.)  That study revealed that Mason had

increased upper airway resistance and restless legs syndrome. (Id.) He was referred to Dr. Sheldon, a sleep specialist at Children's Memorial Hospital. Mason reported to Dr. Sheldon that he never felt refreshed despite sleeping excessively. (Id. at 413.) He reported sleeping for five to six hours after school each day, waking up between 9:00 p.m. and 10:00 p.m. to have dinner, and then sleeping again until 6:30 a.m. (Id. at 414.) Dr. Sheldon diagnosed Mason with idiopathic hypersomnia, counseled him on good "sleep hygiene," and recommended that he shorten his naps. (Id. at 416.) Two months later Dr. Sheldon examined Mason and diagnosed him with circadian rhythm sleep disorder, delayed sleep phase type, and organic sleep apnea, unspecified. (Id. at 421.) Dr. Sheldon prescribed Citalopram and Melatonin and instructed Mason to stop watching television before bed. (Id. at 421-22.)

In December 2007 Mason had a follow-up visit with Dr. Sheldon, who noted that his review of Mason's physical systems was unremarkable. (Id. at 439.) Because Mason reported that he was still sleeping excessively, Dr. Sheldon reiterated his diagnosis of idiopathic hypersomnolence and recommended him for a trial of a drug called Modafinil. (Id. at 440.) A year later Dr. Sheldon described Mason as "delightful and engaging" but still suffering from idiopathic hypersomnia. (Id. at 451.) He recommended Mason continue taking Provigil, a reduced dose of Melatonin, and Nasalcort. (Id. at 443, 451.)

Mason followed up with Dr. Sheldon three times between April 2009 and November 2010. After the April 2009 examination Dr. Sheldon decided that Mason's idiopathic hypersomnolence was not responsive to Provigil, so he started

Mason on Neurontin. (Id. at 456.) Eleven months later Mason returned to Dr. Sheldon reporting continued fatigue and a delayed sleep cycle in which he was falling asleep between 10:00 p.m. and 2:00 a.m. and sleeping until 11:30 a.m. or 12:00 p.m. the following day. (Id. at 384.) He reported sleeping again for two to three hours after school. (Id.) In November 2010 Mason told Dr. Sheldon that he was no longer taking Concerta because his insurance would not cover it, but was taking Ritalin, Armodafinil, and Melatonin. (Id. at 657.) He was sleeping from midnight until late the next morning and napping for two hours in the evenings. (Id.) Dr. Sheldon noted that Mason looked well, was in no apparent distress, and was making all A's in school. (Id. at 657-58.) Dr. Sheldon's final diagnosis was idiopathic hypersomnia and possible circadian rhythm abnormality. (Id. at 658.)

In February 2011 Mason saw a neurologist named Dr. Phyllis Zee for help with his chronic sleepiness and dizziness. (Id. at 709, 711.) Dr. Zee diagnosed him with chronic fatigue syndrome. (Id. at 709.) She referred him for a cardiac tilt table test to confirm the diagnosis. (Id. at 711.) Mason completed the test in September 2011. The results were negative for vasodepressor syncope but positive after he was administered nitroglycerin. (Id. at 751.)

3.     Depression and Anxiety

The record includes extensive notes from Mason's therapy sessions with various professionals at the Kenneth Young Center where he sought treatment for depression and anxiety between 2007 and 2011. At his initial intake in March 2007, Mason reported depression, negativity, poor self-esteem, obsessive worries,

and anger at what he perceived as his school's lack of accommodation for his problems. (Id. at 540.) He described himself as feeling frustrated by others' expectations that he push himself harder. (Id.) Three months later Mason underwent a psychological evaluation with Dr. Siddartha Kumar, to whom he reported sadness, anhedonia, poor energy, poor motivation and concentration, and hypersomnia. (Id. at 516.) Dr. Kumar assigned him a Global Assessment of Functioning ("GAF") score of 55, reflecting moderate symptoms, and diagnosed him with dysthymic disorder, (id.), which is a chronic mood disturbance manifested as depression with symptoms like low energy or fatigue, poor concentration, and hopelessness, *see* Stedman's Medical Dictionary 569, 602 (28th ed. 2006).

In September 2007 Mason underwent two psychological examinations. In the first, conducted by a clinical psychologist, Patricia Cole, Ph.D., Mason reported low levels of pain but what Dr. Cole characterized as "high levels of solicitous reactions on the part of significant others." (A.R. 354.) He also reported anxiety, depression, disrupted sleep, decreased energy, and a decreased ability to concentrate and remember. (Id.) Dr. Cole thought Mason was caught in a "vicious cycle" of depression and anxiety caused by inactivity and "catastrophic thinking." (Id.) Dr. Ai Mukai conducted the second evaluation. (Id. at 357.) Mason told him that he was only attending school from 11:15 a.m. to 3:00 p.m. as an accommodation for his fatigue and that he was napping for four to five hours each day. (Id. at 359.) Following a physical examination, Dr. Mukai diagnosed Mason with chronic low back pain, pelvic obliquity, depression, and sleep disorder. (Id. at 360.)

In the three years following these examinations Mason engaged in therapy sessions with Judy Fadula, LCPC, who at times described Mason as "stubbornly holding on to a belief that he cannot possibly function any better than he is doing," (id. at 544), and unwilling to follow his doctors' directions, (id. at 552). In one mental health assessment Fadula described Mason as able to care for his own personal needs but as having a severe functional impairment in the form of his inability to manage his moods, exercise, or complete tasks. (Id. at 527, 530.) She noted that his depression impacts his physical condition because he lacks the motivation to participate in physical therapy. (Id. at 534.) Fadula diagnosed Mason as having dysthymic disorder. (Id. at 537.)

In August 2010 Mason went through a mental health assessment with Dr. Dankers. She noted that at the time Mason was only seeking medications rather than counselling to treat his symptoms of depression, anxiety, detachment, racing thoughts, and social withdrawal. (Id. at 621-47.) She described his most severe limitations as being only moderate and as pertaining to his ability to manage his health issues, mood, and time. (Id. at 640-41.) Dr. Dankers diagnosed Mason as having recurrent mild depressive disorder and generalized anxiety disorder. (Id.) She assigned him a GAF score of 58. (Id.)

Two months later Mason began seeing Dr. Lawrence Nash, who noted that Mason has a complex history of unusual medical problems. (Id. at 651.) Dr. Nash described Mason's report that he had to give up sports because of his spinal issues as "somewhat self-defeating" because he claimed "that no other activities hold

interest for him." (Id.)  Dr. Nash thought Mason had too much free time to fill with sleep and video games and that Mason was somewhat "sarcastic" and "defeating" about doctors' recommendations.  (Id.)  He added Ritalin to Mason's prescription regimen.  (Id.)  Three months later in January 2011, Mason reported that the Ritalin was helpful and that he was returning to bed for less time during the day. (Id. at 706.)  Dr. Nash noted that Mason's energy was chronically off despite his Provigil and Melatonin prescriptions.  (Id.)

The most recent psychology records are from September 2011, when Mason saw Dr. Nash and Dr. Dankers.  Dr. Nash noted that Mason had been off his medications since the spring, because when he turned 19 his insurance expired.  (Id. at 745.)  He noted that Mason was vague about his mood and anxiety, but was irritable, hopeless about his school prospects, and experiencing back pain.  (Id.) Dr. Nash noted that Mason had never been a good medical historian and that his pursuit of unusual medical problems in the presence of a question of secondary gain was "worrisome."  (Id.)  Dr. Dankers performed a comprehensive mental health assessment and noted that Mason was presenting symptoms of major depressive disorder and needed medication "to prevent deterioration."  (Id. at 736-37.)

4.    Functional Assessments

The record also includes residual functional capacity ("RFC") assessments from several doctors, both treating and consulting.    After seeing Mason approximately three times, Dr. Iveta Boyancheck, a psychiatrist, filled out an RFC form in April 2010 describing him as having mild to moderate limitations in daily

activities, moderate limits in social functioning, and marked limitations in concentration, persistence, or pace. (Id. at 515.) Consulting psychologist Kirk Boyenga, Ph.D., opined that Mason has mild restrictions in daily living and only moderate limitations both with respect to social functioning and concentration, persistence, or pace. (Id. at 609.) Dr. Nash completed a form in January 2011, three months into his treating relationship with Mason, indicating that Mason is unable to function in a competitive work setting for eight-hour days. (Id. at 704.) He also opined that because of his affective disorder Mason has restrictions in daily living, concentrating, and completing tasks. (Id. at 703-04.)

**B.     Mason's Hearing Testimony**

During his November 2011 hearing Mason described the ways in which his symptoms impact his life. He explained that after being up for a few hours he needs to sit down or lie down because he is exhausted. (A.R. 52.) Mason said that even though his Scheuermann's disease is no longer progressing it has left him with residual back pain and that he is always tired and light-headed. (Id. at 53.) He has nausea and dizziness that make it difficult for him to function, although he has never lost consciousness. (Id. at 53-54.) Mason said that as the day progresses and his medical symptoms increase, his anxiety grows as well, creating a "back and forth" between those symptoms. (Id. at 54.) His sleep is never restful and no matter how many hours he sleeps he feels terrible. (Id.) Although he was not in counselling for his psychological issues, he was taking Celexa under the supervision of a psychiatrist. (Id. at 55.)

At the time of the hearing Mason was enrolled in a community college taking a full-time course load of credits. (Id. at 46.) The school was accommodating him with extra time on exams, permission to step out of class as needed, extended due dates for assignments, and attendance flexibility. (Id. at 47.) With those accommodations, he was maintaining a GPA above 3.0. (Id.) Mason described being able to drive to and from school, a trip that takes about 25 minutes each way. (Id. at 49.) When he is not feeling well, Mason stays home, because he feels it is unsafe for him to drive. (Id.) He misses classes at least a couple of times per week and steps out of class because he is not feeling well about four to five times per month. (Id. at 50-51.) He also has problems being on time because he struggles to get out of bed in the morning. (Id. at 51.) Even when he attends class, he struggles to concentrate or focus because he is so exhausted. (Id. at 52.)

Mason testified that he has never had a job because after school he was always too exhausted and would need to sleep. (Id. at 49-50.) He did not participate in any extracurricular activities for the same reasons, even though he loves sports. (Id. at 50.) He takes care of his own hygiene, but relies on his mother to prepare most of his meals. (Id. at 56.)

## C.    The Vocational Expert's Testimony

Vocational Expert ("VE") Craig Johnston also testified at the hearing, describing the kinds of jobs a person with certain hypothetical limitations could perform. (A.R. 58-62.) The ALJ asked him whether any jobs would be available to a person of Mason's age, education, and work experience who can work at the medium

exertional level but who is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements. (Id. at 60.) Additionally, the ALJ asked the VE to assume that the hypothetical person could only engage in simple work-related decision-making with few changes in the work setting and only occasional contact with supervisors, coworkers, and the public. (Id.) The VE testified that the hypothetical individual could work as a dishwasher, janitor, or order filler, and that all of those jobs exist in the thousands in the Chicago metropolitan area. (Id. at 59-60.) Under questioning from Mason's attorney, the VE testified that the jobs he described would be unavailable to a person who needed more than a 15-minute break every four hours with a 30-minute lunch break and an unscheduled five-minute break every two hours. (Id. at 61-62.) When asked whether any of those jobs would be available to someone whose impairments caused him to miss three days of work per month, the VE testified that those absences would render the person unemployable. (Id. at 61.)

**D.     The ALJ's Decision**

A month after the hearing, in December 2011, the ALJ issued a decision finding that Mason is not disabled within the meaning of the Social Security Act. (A.R. 30-31.) In applying the standard five-step sequence for analyzing disability claims, *see* 20 C.F.R. § 416.920, the ALJ found at step one that Mason has not engaged in substantial gainful activity since his July 2010 application date and at step two that he has severe impairments in the form of major depressive disorder, idiopathic hypersomnia, and Scheuermann's disease. (A.R. 21.) At step three the

ALJ found that none of those impairments is of Listings-level severity. (Id. at 22.) In discussing Mason's idiopathic hypersomnia the ALJ stated that "none of the claimant's treating or examining physicians have diagnosed him with chronic fatigue symptom [sic]." (Id.) In considering the severity of Mason's mental impairments, the ALJ found that he has no more than mild restrictions in daily living and no more than moderate difficulties in social functioning and concentration, persistence, or pace. (Id.)

Before turning to step four the ALJ determined that Mason retains an RFC for medium work with the limitations she included in her hypothetical to the VE. (Id. at 23.) Specifically, she found that Mason is limited to no more than simple, routine, repetitive tasks in a work environment free from fast-paced production requirements, with simple decision-making, few changes in the work setting, and no more than occasional contact with supervisors, co-workers, or the public. (Id.) In explaining that decision, the ALJ noted that the objective findings do not strongly support Mason's allegations regarding his symptoms and she found his description of the severity of his symptoms not credible. (Id. at 25, 28.) Turning to step four the ALJ noted that Mason has no past-relevant work, but at step five she concluded that given his RFC Mason is able to work as a dishwasher, janitor, or order filler. (Id. at 29-30.) Accordingly, the ALJ concluded that Mason is not disabled and denied his application for SSI. (Id. at 30-31.)

## Analysis

In moving for summary judgment Mason challenges several aspects of the ALJ's decision, including her evaluation of his diagnosis of chronic fatigue syndrome, her weighing of his treating psychologist's opinion, her credibility analysis, and her reliance on what he describes as the VE's flawed testimony. This court's role in reviewing the ALJ's decision is an "extremely limited" one, involving an inquiry that asks only whether that decision is supported by substantial evidence. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The decision meets that standard if the ALJ relied on adequate record evidence and explained "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The court's role is not to "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder*, 529 F.3d 413. Instead, the court will affirm a supported conclusion "even if reasonable minds could differ" regarding whether Mason is disabled. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted).

## A.     Chronic Fatigue Syndrome

Mason's strongest argument is that the ALJ committed reversible error by mistakenly asserting that none of his physicians had diagnosed him with chronic fatigue syndrome ("CFS") and by failing to evaluate his symptoms under SSR 99-2p, 1999 WL 271569, at *1 (April 30, 1999), which describes the criteria an ALJ must

use to evaluate the symptoms associated with CFS.[2]  Specifically, the ALJ found that "none of the claimant's treating or examining physicians have diagnosed him with" CFS.  (A.R. 22.)  But that assertion is mistaken.  One of Mason's neurologists, Dr. Zee, listed CFS as Mason's diagnosis following a February 2011 consultation.  (Id. at 709.)  The government acknowledges that mistake, but argues that it may be cast aside as harmless error because the ALJ fully analyzed Mason's idiopathic hypersomnolence—a condition which, according to the government, overlaps significantly with CFS.

The Seventh Circuit has repeatedly criticized the government for its over-reliance on the harmless error doctrine in the disability context, *see Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (collecting cases), and here the government's six-sentence harmless-error argument leaves much to be desired.  Essentially, the government cites a sleep education blog that calls CFS and idiopathic hypersomnia "hard to distinguish," and concludes based on that description that the ALJ's discussion of the latter discharges her duty to consider the former.  (R. 28, Govt.'s Br. at 4.)  In other words, the government suggests that because an attorney read online that the two diseases are similar, the court should overlook the ALJ's error.  Never mind that the ALJ never considered, let alone relied on, the blog post cited by the government.  The harmless error doctrine only applies in instances where the court can conclude with certainty that the ALJ would

---

[2]  The SSA's current policy for evaluating claims involving CFS is found at SSR 14-1P, 2014 WL 1371245, at *1 (April 3, 2014).  Because the new policy did not take effect until after the ALJ's decision, the court will evaluate Mason's argument with respect to SSR 99-2p, the policy governing at the time.

reach the same conclusion absent the error.  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).  Here, the government's argument rests on the premise that the ALJ might have reached the same conclusion had she considered the CFS diagnosis because there is overlap in the symptoms of CFS and idiopathic hypersomnolence. But the mere possibility—or even a likelihood—that the ALJ would reach the same conclusion is insufficient to show harmless error.  *See id.* ("But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless.").

The government's careless presentation of the harmless error doctrine aside, now that the issue has been raised, it is this court's obligation to determine whether it is obvious that the ALJ would reach the same decision on remand.  Despite her mistake regarding Mason's CFS diagnosis, at step three the ALJ analyzed whether his symptoms include some of the signs set out in SSR 99-2p.  (A.R. 22.) Specifically, the ALJ wrote that "[a]ccording to SSR 99-2p, the claimant also does not have well documented signs associated with CFS such as a swollen lymph nodes, nonexudative pharyngitis, persistent and reproducible muscle tenderness, or positive tender points."  (Id.)  Those are examples of the kinds of medical signs that the SSA recognized in SSR 99-2p as being associated with CFS.  But there are also laboratory findings and mental findings that may establish its existence, and the ALJ addressed none of those.

With respect to laboratory findings, SSR 99-2p specifically states that CFS may be demonstrated through tilt table testing showing "[n]eurally mediated hypotension." SSR 99-2p, 1999 WL 271569, at *3. Mason underwent tilt table a few weeks before his hearing. (A.R. 750-52.) The conclusions the administering doctor drew from that test are somewhat opaque, and neither party has taken the time to explain them to the court. The administering doctor noted that, "[t]his was a negative tilt table test for VDS in the baseline state. It was positive after NTG administration." (Id. at 751.) Whether that conclusion supports Mason's assertion that the tilt table test results were "positive" for CFS is not obvious. But it is the ALJ's role, not the court's, to consider that question in the first instance. *See Elder*, 529 F.3d 413.

Additionally, SSR 99-2p describes mental findings that may establish the existence of CFS. SSR 99-2p, 1999 WL 271569, at *3. Those findings include documentation of on-going neurocognitive problems, including struggles with concentration. *Id.* The ruling also notes that "[i]ndividuals with CFS may also exhibit medical signs, such as anxiety or depression, indicative of the existence of a mental disorder." *Id.* at *4. Here, Mason's long history of depression and anxiety are well-documented and supported by the clinical evaluations of numerous treating doctors. There is also some evidence that Mason struggles with concentration. (See, e.g., A.R. 515, 609, 704.) Accordingly, there are at least some relevant laboratory and mental signs that the ALJ failed to consider under SSR 99-2p.

Given the ALJ's misread of the evidence regarding Mason's CFS diagnosis and her failure to evaluate the relevant laboratory and mental signs present in the record in accordance with SSR 99-2p, her reference to some of the medical signs described in that ruling is not enough to save her analysis of this aspect of Mason's claim. There is certainly reason to question Dr. Zee's CFS diagnosis, especially in light of the ruling's description of the CDC's definition of CFS symptoms. *See* SSR 99-2p, 1999 WL 271569, at *1-*2. But the court is unable to say with certainty that if the ALJ took into account Dr. Zee's diagnosis, the tilt table test results, and the mental findings in accordance with the governing ruling, that she would draw the same conclusions regarding Mason's claim. Accordingly, the case must be remanded for the ALJ to evaluate Mason's diagnosis in accordance with SSR 99-2p. *See Spiva*, 628 F.3d at 353.

## B.    Mason's Additional Arguments

Although a remand is necessary to allow the ALJ to consider in the first instance Mason's CFS diagnosis in the context of SSR 99-2p, the court is not swayed by the remainder of his arguments. Mason first argues that the ALJ erred by attributing only minimal weight to Dr. Nash's opinion that he has marked restrictions in all three of the paragraph B criteria. (R. 16, Pl.'s Br. at 10.) A treating physician's opinions regarding a claimant's limitations are entitled to controlling weight only where they are well supported by clinical findings and are not contradicted by other substantial evidence. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Even if the treating doctor's opinions are not entitled to

controlling weight, they may be due substantial weight depending on how the ALJ weighs a number of factors, including the longevity and frequency of the treating relationship, and the supportability and consistency of the doctor's opinions. *See* 20 C.F.R. § 416.927(d). The ALJ must explain the weight given to the treating doctor's medical opinion with enough specificity "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Mason argues that the ALJ erred in giving minimal weight to Dr. Nash's opinion based on her conclusion that his opinion is "inconsistent with his own findings and treatment of the claimant." (A.R. 29.) Specifically, the ALJ noted that Dr. Nash only met with Mason three to four times in one year and never recorded in his progress notes the kinds of restrictions reflected in the RFC form. (Id.) Mason argues that Dr. Nash's opinion that he is completely disabled is supported by Dr. Nash's notes describing him as fatigued, anxious, irritated, and sarcastic. (R. 16, Pl.'s Br. at 11.) But the ALJ was within her discretion to conclude that those notes are out of line with Dr. Nash's conclusion that Mason has marked limitations in social functioning, activities of daily living, and concentration, persistence, or pace. And the ALJ was certainly entitled to doubt Dr. Nash's answers on Mason's RFC form where in his most recent treatment notes he described Mason's "worrisome" "pursuit of unusual medical problems," his concern regarding the presence of secondary gain in Mason's case, and his perception that Mason has "never been a good historian" regarding his symptoms. (A.R. 745.) Similarly, in

trying to refute the ALJ's point that Dr. Nash's relationship with Mason was brief, Mason makes much of the fact that Dr. Nash had access to Mason's long-term psychiatric records. But because he points to no evidence that Dr. Nash actually considered or analyzed those records, (R. 16, Pl.'s Br. at 11-12), the ALJ did not err in characterizing the length of the treating relationship as relatively limited.

Mason also challenges the ALJ's assertion that Dr. Nash never suggested that Mason "receive more intense treatment such as more medications or hospitalization." (A.R. 29.) Mason notes that Dr. Nash restarted him on Celexa and added Ritalin to his prescription regiment, and argues that these prescriptions undermine the ALJ's assertion that Dr. Nash did not recommend more intense treatment. But the record shows that Mason started taking Celexa three years before he started seeing Dr. Nash, and Dr. Nash described the Ritalin prescription as a substitute for his previous Concerta prescriptions. (Id. at 359, 651.) Thus there is no obvious error in the ALJ's characterization of Dr. Nash's treatment as being no "more intense" than that provided by his previous doctors. Accordingly, he has not shown that the ALJ erred in discounting Dr. Nash's opinion.

Next Mason objects to the ALJ's conclusion that his testimony was not credible with respect to the severity and limiting effects of his impairments. (R. 16, Pl.'s Br. at 13.) But the ALJ's credibility determination is entitled to special deference and will only be overturned if it is "patently wrong." *See Schomas*, 732 F.3d at 708. Here, the ALJ gave a host of well-supported reasons for discounting Mason's testimony, including the likelihood that someone with the severity of

symptoms he described could maintain his GPA with a full-time college course load even with the accommodations his school provided. (A.R. 28.) Mason faults the ALJ for failing to factor in his frequent absences from school, but the ALJ's point is that Mason has always succeeded at school, and that his success casts doubt on his description of his school-related problems (including attendance). Mason has a better point in criticizing the ALJ's reliance on Mason's daily activities, which mostly consist of playing video games and caring for his dog. An ALJ should be careful about equating these kinds of low-level activities to the ability to consistently perform full-time work. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). But the ALJ gave several other well-supported reasons for the credibility determination. The ALJ noted that his GAF score of 55 shows only moderate restrictions, which contrasts with his claim that he is completely unable to work. (A.R. 28.) The ALJ also noted that there are significant unexplained gaps in Mason's treatment, that he ignored doctors' advice about playing video games before bed, and that his medications and therapy reflect routine treatment. (Id.) Mason has not made any argument as to why those reasons are insufficient, let alone patently wrong. Accordingly, the ALJ's credibility determination may stand.

Mason also argues that the ALJ erroneously relied on the VE's testimony that a hypothetical person with his assigned RFC can perform the jobs of dishwasher, order filler, and janitor. According to Mason, the Dictionary of Titles' ("DOT") descriptions of those jobs are inconsistent with his RFC because they require a reasoning level of two, which involves the ability to understand detailed

but uninvolved written or oral instructions. Mason argues that this requirement is beyond his RFC's limitation to simple, routine, and repetitive tasks. As a practical matter, it pushes the boundaries of credulity to argue that someone who maintains higher than a 3.0 G.P.A. in college courses including calculus and chemistry—and who described attending hours-long chemistry labs—lacks the capacity to understand the directions involved in working as a dishwasher. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (noting that claimant's high school education and nurse training suggests can perform reasoning level 3). But even suspending that reality, the ALJ asked the VE if his testimony was consistent with the DOT, and the VE answered that it was. (A.R. 59.) At the hearing, Mason's attorney did not raise what he now cites as a conflict between the DOT and the VE's testimony. Accordingly, the ALJ's failure to address the question only amounts to reversible error if the inconsistency Mason raises is an apparent conflict. *See* SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000); *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). Apparent conflicts are those which are "obvious enough that the ALJ should have picked up on them without any assistance." *Overman*, 546 F.3d at 463. Given that several courts in this district have concluded that level two reasoning is not inconsistent with a limitation to simple, routine tasks, *see, e.g., McCain v. Colvin*, No. 12 CV 9652, 2013 WL 6283638, at *7 (N.D. Ill. Dec. 4, 2013); *Thompkins v. Astrue*, No. 09 CV 1339, 2010 WL 5071193, at *11 (N.D. Ill. Dec. 6, 2010); *Masek v. Astrue*, No. 08 CV 1277, 2010 WL 1050293, at *22 (N.D. Ill. Mar. 22, 2010), Mason has not shown that there is any inconsistency here, let alone an apparent one. *See*

*Terry*, 580 F.3d at 478. Accordingly, his argument that the ALJ erred in relying on the VE's testimony fails as well.

Finally, Mason argues that the ALJ erred in failing to incorporate into the record a 2011 college accommodation plan that he submitted and discussed at his hearing. (R. 16, Pl.'s Br. at 9.) The accommodation plan, which he attached to his brief as exhibit 1, can be found in the administrative record at page 218, marked as exhibit 17E. Accordingly, Mason's assertion that the ALJ mishandled the exhibit file appears to be unfounded.

## Conclusion

For the foregoing reasons, Mason's motion is granted, the Commissioner's is denied, and the case is remanded for the ALJ to consider Mason's CFS diagnosis in accordance with SSR 99-2p.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**